
IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 2, 2017

# IN RE KIRA G.[1]

**Appeal from the Circuit Court for Greene County**
**No. 12A027   Douglas T. Jenkins, Chancellor**

_____

## No. E2016-01198-COA-R3-PT

_____

This case to terminate the parental rights of a father to his daughter is before the court for the second time. The case began when the mother and stepfather filed the petition to terminate the father's rights and for the stepfather to adopt the child. The petition alleged the grounds of abandonment by failure to visit and support and by engaging in conduct showing a wanton disregard for the welfare of the child, and asserted that termination was in the child's best interest. After a hearing, father's parental rights were terminated; Father appealed. This Court vacated the judgment terminating his rights and remanded the case for the trial court to include written findings of fact and conclusions of law and to consider the four months prior to the father's incarceration in the determination of whether the father had abandoned the child. On remand, the court entered an order which included findings of fact and conclusions of law, and terminated father's parental rights on the grounds alleged in the petition and upon a finding that termination was in the child's best interest. The father appeals. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C. J., and J. STEVEN STAFFORD, P. J., W. S. joined.

Jennifer Luther, Greeneville, Tennessee, for the appellant, Robert P. G., II

Roger A. Woolsey, Greeneville, Tennessee, for the appellees, Mikeal R. T. and Jennifer N. J. T.

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

## OPINION

This is the second appeal brought by Robert P. G., II ("Father") in this termination of parental rights case. The salient facts are set forth in our previous opinion in *In re K. J. G.*:

> The child was born [in 2008]. Father was listed as a parent on the child's birth certificate. [Jennifer N.J.T ("Mother")] and father were never married, though they were living together at the time of the child's birth. Mother testified that father moved out of the home in July 2008, leaving her with the child and the child's older sibling. The latter died in a tractor accident later that year. In May 2012, mother married [Mikeal R.T. ("Stepfather")].
>
> Father admitted at trial that in about 2005 he began using illegal drugs. He testified that in 2009 he sought treatment for his drug use, but that he had begun using again by the summer of 2010. According to him, he last used drugs in May 2013. From April 2, 2012, until July 31, 2012, father was incarcerated for stealing from his father and grandmother. Mother and stepfather (collectively the petitioners) filed a petition to terminate father's parental rights on August 22, 2012.[2] In the same petition, the stepfather sought to adopt the child.
>
> The trial court held a hearing on November 18, 2014.[3] The court found clear and convincing evidence (1) of grounds to terminate father's parental rights and (2) that termination was in the child's best interest. The trial court filed its judgment on January 13, 2015.
>
> \*\*\*
>
> The trial court found three grounds for abandonment under Tenn. Code Ann. § 36-1-102(1)(A)—willful failure to visit, willful failure to support, and wanton disregard for the child's welfare.

No. E2015-00087-COA-R3-PT, 2016 WL 1203800, at \*1, \*2 (Tenn. Ct. App. Mar. 28, 2016).

---

[2] The Petition for Adoption sought termination of Father's parental rights on the ground of abandonment and alleged that termination was in Kira's best interest.

[3] Five witnesses testified at the hearing: Father, Mother, Stepfather, Father's friend Becky Hicks, and Father's father ("Grandfather").

Father appealed; we vacated the judgment and remanded the case for the trial court to prepare written findings of fact and conclusions of law in the order in accordance with Tennessee Code Annotated section 36-1-113(k) and, in that regard, to consider the four months prior to Father's incarceration in its analysis of the evidence rather than the four month period prior to the petition being filed.[4] Following a hearing on April 20, 2016, the court entered Findings of Fact and Conclusions of Law on April 27; the Findings included a section of "findings which were uttered orally at the conclusion of the [November 18, 2014] hearing." Pursuant to the instruction in the order of remand, the April 27 Findings considered the four month period prior to Father's incarceration. On June 1, the court entered an order incorporating the findings set forth in the April 27 document and terminating Father's parental rights on the ground of abandonment by willful failure to visit, willful failure to support, and wanton disregard, and upon a finding that termination was in the child's best interest.

Father appeals, challenging the holdings of abandonment by failure to visit and that termination was in Kira's best interest.

## I. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A. M. H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C. H. K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M. W. A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D. L. B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A. M. H.*, 215 S.W.3d at 808–09;

---

[4] In cases where the parent whose rights are sought to be terminated is incarcerated, Tennessee Code Annotated section 36-1-102(1)(A)(iv) requires the court to apply the four month period prior to the parent's incarceration to its determination of abandonment.

*In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M. J. B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.*, 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## II. ABANDONMENT

Father challenges only one of the three grounds for termination found by the court. Mindful of the instruction set forth by our Supreme Court that, "in an appeal from an order terminating parental rights[,] the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal," we will address the sufficiency of the evidence to support each of the grounds for termination. *In Re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Serv.*, 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016) (footnote omitted).

Abandonment is identified as a ground for termination in Tennessee Code Annotated section 36-1-116(g)(1) and defined in section 36-1-102(1)(A), which reads in pertinent part:

> For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
> ***
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in

4

conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

### A. Failure to Visit

In the final order, the court made the following findings with respect to the ground of failure to visit:

> It was shown to the Court that [Father] had, for the period December 1, 2011 to April 1, 2012, willfully failed to . . . visit the child. . . .

> . . . [T]he Court finds that for the four month period agreed upon between the parties as the "relevant period", [Father] willfully failed to visit the subject child but may have had only had token visitation with the child. Further, during that period of time [Father] did not maintain any relationship other than visitor with the child. [Father] was very open and candid with the Court in this regard and the Court appreciates him telling the truth.

The court then held:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Respondent, [Father], by clear and convincing evidence has willfully failed to . . . visit the child that is the subject of this Petition during the period of time between December 1, 2011 to April 1, 2012, the relevant four (4) month period of time agreed upon by counsel at the trial in this cause pursuant to T. C. A. § 36-1-102. . . .

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that during the relevant four (4) month period of time between December 1, 2011 to April 1, 2012, that the Respondent had only as what would best be described as token visitation with the child . . .

Father does not argue that the above finding is unsupported by the record, and upon our review, we conclude that the record does contain evidence in support of this finding. Rather, Father argues that "the lack of significant visitation was brought about by a climate of hostility toward [Father] and was therefore not willful."

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court discussed willfulness in the context of termination cases:

The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months. . . . Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing. . . . Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty . . . or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.

The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* at 863–64 (citations and footnotes omitted).

Father testified that during the relevant time period from December 2, 2011, until April 1, 2012, he did not have "any kind of regular visitation with [Kira]" and only saw her a couple of times, while she was spending time at Grandfather's home. He testified that "sometimes I'd just stop by my dad's because I figured she was there on the weekends." The first time he did this, he testified that he spent "three or four hours" with her, playing board games and horses. The second time, he testified that he was not sure what they did while they spent time together.

In his brief on appeal, Father argues that numerous people expressed concern about him being around the child and that a "climate of hostility" existed toward him and prevented him from visiting his daughter, rendering his failure to visit not willful. He cites to his testimony that Grandfather told him "he did not need to be seeing" Kira; his testimony that his Stepmother "fussed at Mother, telling [Mother] that [Mother] didn't

6

need to let [Father] have any contact with Kira."[5] While Father characterizes these events as indicative of a "climate of hostility," we do not construe them in that fashion; rather, in light of Father's admitted drug problems, we consider these remarks to be expressions of concern regarding Kira's well-being. Grandfather testified that he told Father that he should not visit with Kira when he was under the influence of drugs; there is no testimony that Grandfather prevented Father from visiting Kira, and we do not conclude that Grandfather's words were intended to restrain or interfere with Father's visitation.[6] There is no evidence that Father sought intervention of a court to help him secure visitation and no competent evidence that anyone prevented Father from visiting Kira during the four-month period. The record fully supports the determination that Father's failure to visit Kira was willful.

The evidence also supports the holding that the two visits Father had with Kira constituted token visitation, which is defined at Tennessee Code Annotated section 36-1-102(1)(C) to "mean[] that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

On the record before us, there is clear and convincing evidence that Father abandoned Kira by failing to engage in anything more than token visitation with her from December 2, 2011 to April 1, 2012.

### B. Failure to Support

Tennessee Code Annotated section 36-1-102(1)(D) defines willful failure to support to mean "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." "Token support" is defined as "support [that], under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A failure to support is "'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey*, 182 S.W.3d at 864.

---

[5] Father also cites to an incident after Kira's T-ball practice as evidence that Kira's extended family prevented his visitation. However, that incident occurred after the petition was filed and is therefore irrelevant to our consideration.

[6] Father testified that he had very serious issues with drugs between 2005 and 2012 and that during the relevant four-month period, he "was still using drugs, but [he] tried not, when [he] was around [Kira], not to do anything." Father testified that Grandfather "said that while I was strung out I did not need to be around my daughter."

With respect to this ground, the court made the following finding:

> The Court also finds that with respect to support of the minor child during this relevant four (4) month time period (December 2011 to April 2012), that [Father] made only one payment in the amount of One Hundred ($100.00) Dollars during that four (4) month period of time which does not amount to more than token support. Respondent was supporting a drug habit during that period of time. Had the money he spent on drugs been given to the mother as support, Father would win instead of not win the case. But during that period of time the Court finds that he willfully failed to support the child by clear and convincing evidence.

The court then held:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that the Respondent, [Father] by clear and convincing evidence has willfully failed to support . . . the child that is the subject of this Petition during the period of time between December 1, 2011 to April 1, 2012, the relevant four (4) month period of time agreed upon by counsel at the trial in this cause pursuant to T. C. A. § 36-1-102.

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that during the relevant four (4) month period of time between December 1, 2011 to April 1, 2012, that the Respondent had . . . only paid token support on one occasion. Respondent acknowledged that he was spending his money supporting his drug habit during that relevant period of time.

The record supports these findings. At the hearing Father was questioned about his work history, involvement with drugs, and child support payments, particularly within the four months prior to his incarceration. Father testified that from 2004 to 2009 he worked at Miller Industries, where he was on drugs "pretty much the whole time." He testified that he worked at Sunrise Community, making $8.50 per hour from August 2009 to September 2010; that he did not pay child support during that period; and that he quit Sunrise because he was starting to use drugs again. He then worked for Advanced Call Center Technologies, making $8.25 per hour, from which "some child support came out of [his] check" and then quit that job. He testified that from May 2011 through October 2012, when he went to work at Cook Foods, he was not working; as to this period he testified:

Q. Now, did you have any health issues then? Any health issues?
A. No, not that I'm aware of.
Q. You were able to work?
A. Yes.

8

Q. You were physically able to work?
A. Yes.
Q. Did you choose not to work for a period of time?
A. Yes.
Q. Why did you not work?
A. I just didn't.
Q. Because you were strung out?
A. Yeah. That and I couldn't find a job, because I had looked.
Q. So it would be fair to say that from May of 2011, you really didn't try to find much work for the next year and a half?
A. I had looked around and put in applications.
Q. But somehow you were able to come up with the money to stay strung out during that time?
A. Yes.
Q. And again, staying strung out continued pretty much on a daily basis?
A. Yes, Sir.
Q. So you would agree with me that from the time that you walked away, you just actually didn't have any desire to work?
A. No.
Q. You'd rather be high?
A. At the time, yes.
Q. And that actually continued from May of 2011 until you finally decided to go to work at Cook Foods in October 2012?
A. Yeah.

Mother and Stepfather introduced the record of Father's child support payments maintained by the Child Support Enforcement Services division of the Tennessee Department of Human Services for the period December 1, 2011 through April 1, 2012, showing that Father made one payment of $100 during the December 1, 2011 to April 1, 2012 period. Also introduced were certified copies of his convictions during the four month period, showing that he was convicted on eight charges of forgery and one charge of theft under $500.

In our consideration of the issue of willfulness of Father's failure to pay support, we note the holding in *In re Karissa V.*:

> Although illegal drug abuse and the purchase or sale of illegal drugs may well be relevant to determining whether a parent willfully has failed to support his or her child while supporting his or her drug use, illegal drug activity by itself does not establish willfulness.

No. E2016-00395-COA-R3-PT, 2017 WL 758513, at *11 (Tenn. Ct. App. Feb. 27, 2017). The evidence shows that Father had the ability to work, as he held numerous jobs

from 2004 until May of 2011, when he chose to stop working and engage in behavior that had the effect of preventing him from securing gainful employment; he resumed employment in October 2012. His testimony is clear that any money he received during his period of no employment, which included the four month period at issue, went to purchase drugs rather than to pay support for his daughter. The evidence is clear that Father was able to get money to support his drug habit but did not pay meaningful support for Kira.[7] This was a choice he made and constituted willfulness within the meaning of the statute. The evidence clearly and convincingly establishes the elements necessary to terminate Father's rights on the ground of abandonment by willful failure to support.

### C. Wanton Disregard

Tennessee Code Annotated section 36-1-102(1)(A)(iv) defines abandonment as occurring when "the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Our courts have held that a finding of wanton disregard need not be based on conduct occurring during any particular time period. *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). In *In re Audrey S.*, this Court noted that:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child.

182 S.W.3d at 866 (internal citations omitted). Incarceration alone is not a ground for termination of parental rights, as it "is not an infallible predictor of parental unfitness." *Id*. Rather, a parent's incarceration serves as a "triggering mechanism," allowing a court to "take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a substantial risk to the welfare of the child." *Id*.

In this case, the court made the following findings with respect to wanton disregard:

---

[7] Viewed in this context, the trial court's finding that the $100 paid by Father during the four month period constituted "token support" is supported by the evidence.

10

Then that brings us to willful disregard[8] for the welfare of the child. The Court believes that that ground as well has been proven by clear and convincing evidence because of [Father's] frequent incarceration in and out of jail during this period of time. There were violations of probation, admitted total dependence on drugs, frequently intoxicated and under the influence of drugs, and when he wasn't in such a state he was thinking about a way to get there. That exhibits a wanton disregard for the welfare of the child, so the Court finds that ground as well has been sustained.

The court then held:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that by clear and convincing evidence that the Respondent exhibited a willful disregard for welfare of the child demonstrated by his frequent incarcerations, his repeated violations of probation, his admitted total dependence on drugs, frequent intoxication of both alcohol and drugs and his admitted desire to be high or intoxicated or thinking of ways to become intoxicated.

Father testified that he used drugs daily from 2005 to 2009, at which point he went to rehab and "had nine months clean." He testified that he relapsed and continued to use drugs until 2012. In addition to his drug addiction, the record contains copies of Father's convictions of forgery for attempting to pass Grandfather's checks in January and February 2012, of theft in March 2012 for exercising control over personal checks belonging to Grandfather without permission, and of theft over $1,000 and less than $10,000 for stealing from his grandmother. Father pled guilty to all charges and testified that he was incarcerated in 2012 on the theft charge.

There is clear and convincing evidence that, prior to his incarceration, Father engaged in criminal behavior to support his drug habit, exhibiting a wanton disregard for the welfare of Kira.

## III. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the

---

[8] As noted in our opinion in the first appeal, the trial court and parties used the phrase "willful disregard" and "wanton disregard" interchangeably. *See In re K. J. G.*, 2016 WL 1203800, at *2 n.2. Though the language "willful disregard" does not appear in Tennessee Code Annotated sections 36-1-102(1)(A) or -113(g), the parties and court continued to use it after this case was remanded. It is clear from the record that all references to "willful disregard" were intended to reference the ground of abandonment by engaging in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[9] The list of factors in the statute "is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S. L. A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dep't. of Children's Serv. v. T. S. W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I. C. G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

In the final order, the court made the following findings with respect to Kira's best interest:

> That brings me to the final part of the analysis in a termination case. And that is whether termination of the father's parental rights is in the best interest of the minor child. The Court believes, based on proof that it has

---

[9] The factors at Tenn. Code Ann. § 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

heard that termination of the father's parental rights is in the best interest of the minor child because the minor child is in a stable home where she has had a three (3) year stable life where she's developed a relationship with the man of the house, very close and loving relationship. It has been described as very much like a father/daughter relationship should be. The Court finds that the child's stability, the child's need for stability in her life trumps the father's parental rights and the rights to raise his own child. The Court believes that ground as well has been proven by clear and convincing evidence for the reason I just said together with the other reasons that we've already talked about (father's addiction issues and unstable life with no real disposition to see or provide for his child) [as] we went through the grounds analysis.

The court then held:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the termination of the Respondent's parental rights with and to the child that is the subject of this Petition is in the best interest of the minor child. The Court finding that the child has been in a stable home with the Petitioners for the past three (3) years where she has developed a strong relationship with the prospective adoptive father which is very loving and close providing the stability in her life so lacking in the Respondent's relationship with the child.

The evidence in the record supports these findings. Mother testified that her home situation with Stepfather is "very stable"; that Kira is "in an advanced first grade program"; that Kira is "very happy." Stepfather testified that he has a "strong" relationship with Kira; that he is "strict" and "hard on Kira" and "want[s] her to do the best she can" because "[s]he has all kinds of abilities." He testified that he helps her with school and that he is employed and has been helping to support her since 2011.

Father argues that "several factors that would have been in his favor were not addressed." Specifically he asserts that since his release from incarceration in April 2014 he has made an adjustment of his circumstances that would allow for Kira to safely be in his home (factor 1), that he has supported Kira regularly (factor 9), and that he has maintained regular visitation with Kira (factor 3).

As evidence of adjustment in his circumstances, Father cites to his testimony that he was incarcerated from May 2013 to April 2014; that he has been working since his release and has child support and health insurance for Kira taken out of his paycheck; that the home he currently lives in is "not the best, but [he] lives there with [his roommate, who was released from incarceration a few months before Father] and his mother"; that when he is not working, he "usually just sit[s] at the house and play[s] X-Box" and "just

13

tr[ies] to stay out of trouble, stay at home"; and that he has not used drugs since May 2013. As evidence of support Father has provided for Kira, he cites to his testimony that, since he has been released from incarceration, he has provided clothes and birthday presents to Kira "several times";[10] that he bought snacks for the two of them while he visited her at Grandfather's home, and rented movies for them to watch. With respect to factor 3, Father cites his testimony that he has visited with Kira every other weekend since being released from incarceration and that he and Kira have a "father/daughter relationship."

> In considering this issue we are mindful of the instruction in *White v. Moody*:
>
> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

The record shows that Father has taken measures since being released from incarceration to improve his life and that, through regular visitation, he has begun to establish a relationship with Kira. As noted earlier, the evidence is clear and convincing that Kira is currently in a stable home environment where she is beginning to excel at school and where her Mother and Stepfather love her and are involved in her life. The trial court correctly focused on Kira. The evidence adduced by Father with respect the best interest factors does not preponderate against the findings of the trial court or outweigh the factors that the trial court considered determinative. We affirm the holding that termination of Father's rights is in Kira's best interest.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court in all respects.

_____
RICHARD H. DINKINS, JUDGE

---

[10] On further examination, however, Father testified that he gave Kira a doll her for her birthday but had not bought her any clothes.